LAW OFFICES OF PERRY C. WANDER
PERRY C. WANDER, ESQ.
(Bar No. 102523)
9454 Wilshire Boulevard
Penthouse Suite
Beverly Hills, California  90212
Telephone:  (310) 274-9985
Facsimile:  (310) 274-9987
pcwlaw@msn.com

Attorney for 6126, LLC, a Delaware Limited Liability Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 6126, LLC., A DELAWARE LIMITED LIABILITY COMPANY DBA 6126 COLLECTION;<br><br>       Plaintiff,<br><br>vs.<br><br>D.N.A.M. APPAREL INDUSTRIES, LLC., A CALIFORNIA LIMITED LIABILITY COMPANY, AND DOES 1 THROUGH 10, INCLUSIVE, | Case No. CV13-00673-FMO (CWx)<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1. **BREACH OF CONTRACT**<br>   **(Based On Written Agreement)**<br><br>2. **FRAUD**<br>   **(Based On Promise Without Intent To Perform )**<br><br>3. **FEDERAL TRADEMARK INFRINGEMENT**<br>   **(Based On Violation of 15 U.S.C. 1114 (1))** |

Plaintiff 6126, LLC., DBA 6126 Collection (hereinafter "Plaintiff" or "6126"), hereby alleges, based upon information and belief, except as to allegations concerning Plaintiff, or his counsel, which allegations are made upon Plaintiff's personal knowledge, against Defendants D.N.A.M. Apparel Industries, LLC., and DOES 1-50, inclusive (hereinafter "Defendant" or DNAM), as follows:

# I

## INTRODUCTION

1.      6126, LLC. ("6126") owns the trademark to 6126 Collection which is a clothing line that was created by American actress, singer, and entrepreneur Lindsay Lohan (hereinafter "Lohan") in collaboration with Kristi Kaylor (hereinafter "Kaylor"). The line was originally a leggings line, before being expanding to a full woman's clothing, beauty and accessories collection. The name of the collection represents the June 1, 1926 birth date of Marilyn Monroe, whom Lohan has said she admires and has been influenced by.

2.      6126 Collection is sold at such United States retail stores as Neiman Marcus, Nordstrom, and Bloomingdale's and at D-A-S-H boutique owned by Kim Kardashian. The collection has also been featured in worldwide stores such as Kitson, Harrods, Lane Crawford and Fred Segal.

3.      Lohan has partaken in numerous photo shoots and modeled to help advertise and promote the collection. Her younger sister, Ali Lohan, has also modeled to promote the collection. 6126 decided they wanted to license their trademark and expand the collection and were approached by DNAM's President Henri Levy whose company manufactures wholesale women's and children's clothing, and clothing accessories.

4.      In or about December of 2009 the parties met and decided to enter into an exclusive worldwide trademark license agreement for an initial term of 2 years to manufacture licensed products for sale throughout the world.  An advance of $100,000 was paid against royalties of 10% of the net sales of licensed products.

## II

## **STATEMENT OF FACTS**

5.    In or about December of 2009, D.N.A.M. APPAREL INDUSTRIES, LLC., ("DNAM") and its President Henri Levy and entered into a written agreement with 6126  and its managing members entitled "Exclusive Trademark License Agreement for 6126" (hereinafter "Agreement").  A true copy of the Agreement is attached hereto and incorporated here in as Exhibit  "A".

6.    Plaintiff 6126 registered with the United States Patent and Trademark Office on August 31, 2010 as Serial Number 77489628 its trademark for goods and services which included garments such as dresses, knit shirts, tee shirts and trousers.

7.    Commencing in or about December of 2009 and continuing through the present, DNAM and its President Henri Levy breached the Agreement with 6126 by, including but not limited to, the following acts:

A.  Failing to pay 6126 the Minimum Guaranteed Royalty Payments as outlined and required under section 4.4 of the Agreement; to wit; $200,000 for Contract year 1 $300,000 for Contact Year 2 which ended on April 30, 2012;  and $400,000 for Contact Year 3 which ends on May 15, 2013.

B.  Failing to send 6126 a statement of accounting of all Licensed Products (the "Royalty Report") as required under section 4. 5 of the Agreement;

C.  Failing to use defendants' best efforts to develop diligently the sale of Licensed Products in the Territory, build and increase sales volumes of Licensed Products consistent with the Territory's potential, promote better customer relations,

and enhance the image and further the reputation of Licensor and Licensed Products as required by section 6.1 of the Agreement;

D.  Failing to use defendants' best efforts to manufacture and ship Licensed Product in order to meet the demand and failing to perform within a reasonable time of receipt of orders or by the delivery date specified in the order;

E.  Failing to meet advertising minimums as required by section 7.3 of the Agreement and failing to pay for and prepare photo "look books" , "line sheets" and Updated press kits;

F.  Failing to obtain approval of advertising, marketing, and/or promotional materials from 6126 as required under section 7.3 of the Agreement;

G.  Failing to participate in at least two trade shows as required under section 7.4 of the Agreement;

H.  Failing to obtain design approval pursuant to section 8.1 of the Agreement;

I.  Failing to obtain approval of samples pursuant to section 8.2 of the Agreement;

J.  Failing to maintain sale standards as outlined in section 9.1 of the Agreement;

K.  Breaching section 9.2 of the Agreement by selling Licensed Product to unauthorized stores;

L.  Failing to spend not less than ten percent of its net sales generated from the Website (as defined in section 9.4 of the Agreement) towards the advertising, promotion and marketing of the Licensed Product;

M.  Violating section 9.7 of the Agreement by manufacturing, marketing, selling, and/or using styles or designs used in Licensed Products for private label purposes, which includes Defendant's own lines; and

N.  Breaching section 10.1 of the Agreement by failing to maintain the image and quality of the 6126's Trademark, as "Trademark" is defined in the second paragraph in the Agreement.

COMPLAINT FOR DAMAGES

8.   In or about December of 2009, Henri Levy, at DNAM's offices made the following oral misrepresentations of material fact to 6126's principals and representatives, Lohan, and Kaylor, as follows:

A.  That they would produce licensed items in a timely manner;

B.  That they would produce quality items;

C.  That they would not sell licensed product through private label channels;

D.  That they would meet minimum sales requirements as outlined in the Agreement;

E.  That they would meet advertising minimums as outlined in the Agreement;

F.  That they would pay royalties to Plaintiff as outlined in the Agreement;

G.  That they would get approval from Plaintiff on all licensed product prior to distribution;

H.  That they would get approval on all samples of licensed product prior to them being manufactured;

I.  That they would get approval on advertising, marketing, and promotional material concerning Licensed Product and /or the Trademark prior to its publication, exhibition, or other use.

J.  That they would maintain, or better the image and quality of the trademark;

K.  That they would sell shoes, cosmetics, and swimwear as licensed product;

L.  That they would open retail stores on behalf of the Plaintiff's trademark;

M.  That they would use their best efforts to develop the sale of Licensed Product, build and increase sales, promote better customer relations, and enhance the image of the Trademark;

N.  That they would participate in at least two trade shows per year to promote Plaintiff's brand of clothing;

O.  That they would expand distribution globally;

P.  That they would create a corporate showroom in New York City; and

Q.  That they would not sell to unauthorized stores.

COMPLAINT FOR DAMAGES

9.   On or about  February 14, 2011 and April 19, 2011 Plaintiff 6126, through its counsel, Wolf, Rifkin, Shapiro, Schulman, & Rabkin,  sent a letter to defendant DNAM outlining the foregoing  breaches of the trademark license Agreement and advising the defendant that the license agreement was terminated pursuant to Paragraph 15.1 of the Agreement.  Plaintiff is informed and believes and thereon alleges that despite the termination of the license agreement by Plaintiff due the multiple breaches thereof, defendant DNAM continued to sell 6126 trademarked merchandise on websites throughout the world without the knowledge or authorization of plaintiff 6126 in direct violation of Plaintiff 6126's registered trademark and in violation of the Agreement between the parties.

## JURISDICTION AND VENUE

10.   Plaintiff 6126 is a Delaware Limited Liability corporation incorporated under the laws of the State of Delaware and defendant DNAM, is a California limited liability company organized and existing under the laws of the State of California, with its principal place of business in the State of California.

11.   This is a civil action arising under the laws of the United States relating to trademarks (15 U.S.C. Sections 1125(a)).  This Court has jurisdiction over the Third Cause of Action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b).  This Court has supplemental jurisdiction over the First and Second Causes of Action pursuant to 28 U.S.C. § 1367.

12.   Personal jurisdiction over the defendant is proper because it is a California corporation with its principal place of business in California and defendants has purposefully availed themselves of the privilege of conducting business activities within the State of California by employing workers within California and selling its goods and services within the State.  Defendant generally has maintained systematic and continuous business contacts with California.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendants has sufficient minimum contacts for the exercise of personal jurisdiction in this district.

## PARTIES

14. At all times herein mentioned, Plaintiff 6126 is a Delaware Limited Liability, with its principal place of business in California.

15. Defendant DNAM is a California limited liability company organized and existing under the laws of the State of California, with its principal place of business in the country of Los Angeles.

16. At all relevant times herein, Henri Levy is a resident of the county of Los Angeles, State of California and is the owner of DNAM and is a director, and or managing member of DNAM and its subsidiaries.

17. At all relevant times herein, DOES 1-50 inclusive, were fictitious names for individuals, partnerships, joint ventures, corporations, limited liability corporations or other forms of legal entities, the identities of which are unknown at the present but who are liable to the Plaintiff for committing the acts and/or omissions mentioned herein. Plaintiff will amend this Complaint to allege the true names of DOES 1 through 50 when Plaintiff learns those names.

## FIRST CAUSE OF ACTION

### (For Damages Based on Breach of Written Contract)

18. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

19. Cross Complainant has performed each and every one of the obligations under the terms and conditions of the Agreement.

20. By the terms of the Agreement defendant DNAM were required to pay Plaintiff 6126 the Minimum Guaranteed Royalty Payments as outlined and required under section 4.4 of the Agreement; to wit; $200,000 for Contract year 1 and

1    $300,000 for Contact Year 2 which ends on April 30, 2012;

2         21.   By the terms of the Agreement defendant DNAM were required to pay

3    Plaintiff 6126 royalties of 10% of net sales in excess of the $100,000 initial advance

4    per 4.1 of the Agreement.

5         22.   Defendant DNAM has failed to pay royalties of 10% of net sales in

6    excess of the $100,000 initial advance per 4.1 of the Agreement which Plaintiff

7    estimates at over ($2,000,000) two million dollars resulting in a 10% royalty payment

8    of $200,000 owed to Plaintiff.

9         23.   Defendant DNAM has failed to pay the minimum guaranteed royalty

10   payments required under section 4.4 of the Agreement; $200,000 for Contract year 1,

11   $300,000 for Contract Year 2 and $400,000 for Contact Year 3. Plaintiff has thus

12   suffered damages in excess of $1,100,000 to date.

13        24.   Plaintiff DNAM has been required to retain the services of the Law

14   Offices of Perry C. Wander, with regard to this matter, and Plaintiff is entitled to be

15   reimbursed for its reasonable attorneys' fees and the court costs incurred in this matter.

16        25.   Plaintiff also seeks special damages for lost profits and loss of good will

17   and economic advantage, according to proof at trial.

18        26.   Plaintiff has been damaged by the actions of  defendant DNAM in an

19   amount at present unknown, but in excess of $75,000, according to proof at trial.

20                        **SECOND CAUSE OF ACTION**

21            **(For Fraud Based on Promise Without Intent to Perform)**

22

23        27.   Plaintiff hereby incorporates by reference the allegations contained in the

24   foregoing paragraphs as if fully set forth herein.

25        28.   In or about December of 2009, when Henri Levy, made the following

26   oral misrepresentations of material fact (Paragraph 7. A-Q incorporated by reference

27   herein) together with the written promises contained in the Agreement to pay royalties

28   of 10% of net sales in excess of the $100,000 initial advance and the minimum

1   guaranteed royalty payments he did so without the intent to perform.

2       29.   These written and oral representations were made by Henri Levy on

3   behalf of defendant DNAM, constituted a knowingly false representation of material

4   facts, with the intent to deceive and induce reliance on the part of Plaintiff to enter

5   into the Agreement. These oral representations were made by Levy December 1, 2009

6   through the execution of the Agreement at DNAM's offices.

7       30.   The true facts were that Henri Levy, on behalf of defendant DNAM,

8   intended to deceive Plaintiff, by concealing the fact that defendant DNAM had no

9   intention of paying Plaintiff's any royalties after the initial advance of $100,000.

10      31.   Defendant DNAM knowingly intended to induce Plaintiff's reliance on

11  the false representations made by Henri Levy on behalf of defendant DNAM.  The

12  truth was that DNAM intended to only pay the initial advance and then with the intent

13  to deceive and defraud Plaintiff as alleged herein.

14      32.   Plaintiff is informed and believes and therein alleges that when Henri

15  Levy, on behalf of defendant DNAM, knowingly made these false representations, he

16  did so with the intent to deceive and to induce Plaintiff to enter into the Agreement.

17      33.   Plaintiff is informed an believes and therein at the time, that defendant,

18  DNAM knowingly made these false representations he did not have the intent to fulfill

19  this promise and intended to mislead Plaintiff. The representations were in fact false

20  and known to defendants and each of them to be false at all times herein mentioned.

21

22      34.   Defendant's intended to deceive Plaintiff of the true facts, and induce

23  them to enter into the Agreement and had Plaintiff known the true facts they would

24  not have entered into the Agreement. These intentional misrepresentations, non-

25  disclosures and suppression of said material facts, were made with the intent to

26  defraud and deceive Plaintiff and induce Plaintiff to enter into Agreement.

27      35.   At the time that defendants, and each of them, made such representations,

28  non-disclosure and suppression of facts, Plaintiff was ignorant of the falsity of the

9

representations and believe them to be true, and were ignorant of the existence of the facts as specified above, which said defendants suppressed and failed to disclose.

36.   In justifiable reliance on these representations, non-disclosures and suppression of facts specified above, Plaintiff was induced to act as alleged herein. Plaintiff justifiably relied on these representations because DNAM had licensed other celebrity brands.   Said reliance by Plaintiff was reasonable and justified in that Plaintiff could not, in the exercise of reasonable diligence, have discovered defendants' true intention.

37.   Plaintiff has suffered general damages by the actions of defendant DNAM, in an amount at present unknown, and plaintiff will seek leave of Court to amend this Complaint when the amount does become known, or according to proof at trial.

38.   Plaintiff has suffered special damages in an amount at present unknown, and plaintiff will seek leave of Court to amend this Complaint when the amount does become known, or according to proof at trial.

39.   Defendant, DNAM, as the employer of Henri Levy, authorized and ratified the wrongful conduct of its employees, , and acted with oppression, fraud and malice and a conscious indifference to the consequences of their failure to act as alleged herein and intended to cause injury to the Plaintiff and acted with a conscious disregard for the safety of Plaintiff and it brand and did in fact cause injury to Plaintiff and this conduct, as alleged herein, constituted a conscious disregard of Plaintiff's rights under the Agreement  and a conscious indifference to the consequences of their failure to act, as alleged herein and justifies an award of punitive and exemplary damages, in an amount according to proof at trial.

40.   As a proximate result of defendants and each of their fraud and deceit, Plaintiff was induced to enter into the exclusive license Agreement, all to its damage according to proof of trial.

## THIRD CAUSE OF ACTION

### (Federal Trademark Infringement in

### In Violation of 15 U.S.C. 1114 (1)

41.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

42.    Plaintiff's mark "6126" is registered with the United States Patent and Trademark Office.  Plaintiff has exclusive ownership rights in the name 6126.

43.    Plaintiff has a reasonable interest in the commercial value of its name based on the fact that they have retained exclusive ownership and control in the name of the company; and can only relinquish control in his name through licensing; and they have the right to compensation for use of the company's name on goods.

44.    Through various  websites, Defendant has continued to advertise and sell garments under the 6126 license agreement after the agreement was terminated by Plaintiff due to defendant DNAM's breach in direct violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

45.    The public is likely to conclude, however, that the use of Plaintiff's name on Defendants' website in connection with the promotion and marketing of its garments signifies 6126's endorsement, approval, or association.  Thus, there is a strong likelihood of confusion regarding Plaintiff's association with Defendant's products.

46.    Defendants' unauthorized use of Plaintiff's name on websites in the promotion and marketing of 6126 garments impaired Plaintiff's reasonable interest in the commercial value of licensing and merchandising its name, particularly with respect to Plaintiff's ability to effectively market its name in connection with its own label, or that of other products which Plaintiff would actually want to endorse.

47.    Defendants' use of Plaintiff's name on websites also deprived Plaintiff of the goodwill stemming from the public knowledge of the true source of the products that bear Plaintiff's name.

COMPLAINT FOR DAMAGES

48. Based on the foregoing, Plaintiff seeks compensatory damages in an amount to be determined at trial, representing three times the amount of Defendants' profits and Plaintiff's lost licensing fees, plus interest, costs of suit, and attorney fees.

49. Defendant had actual knowledge of Plaintiff's rights in the 6126 trademark and had actual and constructive knowledge of Plaintiff's rights under section 22 of the Lanham Act 15 U.S.C. § 1125(a).

50. Defendants' conduct unless enjoined, will cause irreparable harm and injury to Plaintiff, for which Plaintiff will not, and do not have an adequate remedy at law.

51. Plaintiff is entitled to attorney fees because defendant has violated the written agreement which provides for attorney fees and because defendant has violated Section 35(a) of the Lanham Act 15 U.S.C. § 1117(a).

52. By virtue of the aforementioned acts, defendant has violated Section 32 (1) of the Lanham Act 15 U.S.C. § 1114(1).

53. As a proximate result of the Defendants' violation of the Agreement, Plaintiff has suffered general damages by the actions of defendant DNAM, in an amount at present unknown, and plaintiff will seek leave of Court to amend this Complaint when the amount does become known, or according to proof at trial.

WHEREFORE, Plaintiff demands judgment as follows:

    a. For an order by the Court enjoining Defendant and their agents, servants, and employees, and all such persons and/or entities acting under, in concert with, or for it from using the name of Plaintiff in connection with any of their products or in connection with the marketing, distribution or advertising of any of their products;

    b. An order requiring Defendants: (a) to cease the acts of trademark infringement alleged herein; (b) to comply with this State's statutory and common law trademark rights;

COMPLAINT FOR DAMAGES

c. An order requiring Defendants to deliver all advertising, merchandise, promotional materials, and any and all things bearing Plaintiff's name to Plaintiff;

d. Plaintiff also requests that Defendants be made to account to Plaintiff for all sales and all related merchandise featuring Plaintiff's name to the date of judgment herein so that the Court may order the disgorgement of all profits earned by Defendants as a result of their wrongful acts or such other amount as the Court shall find to be just according to the circumstances of the case;

e. For general damages according to proof at trial;

f. For special damages according to proof at trial;

g. For exemplary or punitive damages against Defendants for their oppressive, fraudulent, and malicious conduct;

h. Treble damages representing three times the amount of Defendants' profit from sales for their unlawful use of Plaintiff's name;

i. Pre-judgment and post-judgment interest at the maximum rate allowable at law;

j. The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees and costs of suit; and

k. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED:  January 31, 2013                    LAW OFFICES OF PERRY C. WANDER

                                            By

                                            Perry C. Wander, Esq.
                                            Attorney for Plaintiff 6126, LLC

COMPLAINT FOR DAMAGES

# EXCLUSIVE TRADEMARK LICENSE AGREEMENT
## FOR 6126

This Exclusive License Agreement (this "Agreement"), dated as of December__, 2009 (the "Effective Date"), is by and between 6126, LLC, a Delaware limited liability company, ("Licensor"), on the one hand, and DNAM Apparel Industries, LLC, a California Limited Liability Company,  on the other ("Licensee").

WHEREAS, Licensor is the owner of U.S. Trademark  Registration No. 3661967, registered with the United States Patent and Trademark Office ("USPTO"), and/or common law rights in and to the trademark **6126** for International Classification 25 (the "Trademark") in parts of the Territory (as defined in this Agreement), with respect to women's leggings, and has a pending application with the USPTO for other clothing items (Serial No. 77489628); and, Licensee is in the business of, and has the experience, know-how and contacts to manufacture market, advertise, distribute sell at wholesale, retail and through the internet (including the right to operate In-Store shops) the Licensed Products within the Territory (as defined in this Agreement); and

WHEREAS, Licensee desires to license from Licensor, and Licensor desires to license to Licensee, the right to use the Trademark in connection with the manufacture, advertising, marketing, distribution and sale of  the Licensed Products bearing the Trademark within the Territory, as provided in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual obligations and promises made in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee (the "Parties") agree as follows:

1.    Exclusive License/Licensed Products.

1.1    Licensed Products.  The term Licensed Products shall mean the item or items of apparel bearing the Trademark which are covered by the exclusive license granted under this Agreement, as set forth in Exhibit A annexed hereto.

1.2    Exclusive License.  Subject to the terms and conditions contained in this Agreement, Licensor hereby grants to Licensee the exclusive right to use and exploit the Trademark in connection with the design, manufacture, marketing, advertising, distribution and sale, at wholesale and retail and through the internet (including the right to operate In-Store shops) the Licensed Products within the Territory.  Notwithstanding anything to the contrary herein, Licensee acknowledges and agrees that its right to use and exploit the Trademark in connection with the design, manufacture, marketing, advertising, distribution and sale of shoe wear and denim will not commence until January 1, 2011 it being understood however that the Guaranteed Minimum Royalties and Minimum Sales (as said terms are defined herein) remain the same.

2.    Territory.  The license and distribution territory to which this Agreement applies shall be Worldwide (the "Territory").

3.    Term/Early Termination.

3.1    Initial Term.  The initial term of this Agreement shall run from the Effective Date through May 15, 2013, unless sooner terminated as provided in this Agreement (the "Initial Term").

3.2     Option for Additional Term.  Provided that Licensee is not in default, has complied with all of its obligations under this Agreement applicable to the Initial Term (including without limitation the payment of Minimum Royalties), and Licensee has achieved at least $7,000,000 in Net Sales in the 3rd Contract Year of this Agreement, Licensee shall have the option, at its sole discretion, by giving notice in writing to Licensor at least thirty (30) days prior to the end of the Initial Term to renew this Agreement for an additional term (the "Renewal Term") of 36 months, commencing on May 16, 2013 and expiring on May 15, 2016.

3.3     Contract Years.  The first "Contract Year" of the Initial Term shall run from the Effective Date through May 15, 2011.  Each subsequent "Contract Year" of the Initial Term and Renewal Term, if any, (collectively, the "Term") shall be 12 consecutive months.

3.4     Marketing Date.  Except for shoes and denim, Licensee shall begin selling the Licensed Products by February 15, 2010 but no later than May 15, 2010.  If Licensee has not commenced the sale of the Licensed Products to the public by May 15, 2010, Licensor may elect to terminate this agreement immediately by giving notice in writing to Licensee.

3.5     Reversion of Rights.  If Licensee has not commenced the sale of each Licensed Product (on a Licensed product by Licensed product basis) to the public by May 15, 2011, Licensor shall have the option, at its sole discretion, by giving notice in writing to Licensee anytime after May 15, 2011, subject to a 30 day cure period from the date Licensor gives written notice thereof to terminate all rights to use the particular Licensed Product(s) which have not been sold to the public by May 15, 2011, and all such rights shall revert to Licensor except if the reason for not marketing the Licensed Products is as a result of Licensor's gross negligence.

4.     Advance/Royalties.

4.1     Advance Against Royalties.  As a recoupable advance against Royalty Payments due under this Agreement, Licensee will pay to Licensor $100,000 upon execution of this Agreement (the "Initial Advance").  In the event the Initial Advance is not paid upon execution of this Agreement, this Agreement shall be null and void and neither party shall have any obligations or duties to the other party.  In addition, if on or after January 11, 2011, Licensee notifies Licensor in writing of its decision to exploit shoe wear as a Licensed Product bearing Licensor's Trademark, Licensee shall pay Licensor an additional an additional advance  of $100,000 which shall also be considered a recoupable advance against all Royalty Payments due under this Agreement.  Notwithstanding the foregoing, the Initial Advance and the Shoe Advance shall be non-recoupable if Licensor elects to terminate this Agreement prior to the expiration of the Initial Term, pursuant to its early termination rights set forth herein.

4.2     Royalties.  Licensee shall pay to Licensor as royalties for the use of the Trademark as follows:  Ten percent (10%) of the Net Sales (as defined in this Agreement) of Licensed Products.

All such royalties shall accrue when a Licensed Product is invoiced and shipped.

4.3     Net Sales.  As used in this Agreement, the term "Net Sales" shall mean the gross dollar amount of all sales by Licensee or on behalf of Licensee of Licensed Products less: (i) all bona fide returns of Licensed Products accepted and authorized by Licensee, (ii) bona fide trade discounts and allowances, and (iii) customer freight or shipping charges actually paid (collectively, "Allowed Deductions").  Any sales or transfers of Licensed Products by Licensee to any person or entity that does not deal at arm's length with Licensee shall be computed, for the purpose of determining Net Sales, at an amount equal to the price at which Licensee would

2

Products, and within a reasonable time of receipt of the order or by the delivery date specified in the order.

6.2     Cooperation with Other Licensees.  Licensee acknowledges that (i) it is one of various current and future licensees of the Trademark; (ii) Licensor has obligations to all licensees of the Trademark; (iii) it is Licensor's goal to have all licensees produce products that are reasonably consistent and cohesive in terms of theme, style, design, coloration, materials, trim, identification, etc. and that cause consumers to perceive that the products of all licensees emanate from a single source.  Licensee acknowledges the value of this perception to Licensee, Licensor and all other licensees of the Trademark.  Licensee agrees to reasonably cooperate with all other licensees of the Trademark in (i) the reasonable sharing of information regarding materials and other resources; (ii) the reasonable sharing of design, merchandising and marketing ideas, concepts and materials; and (iii) other aspects of the production and sale of Licensed Products where cooperation is materially helpful to other licensees.

6.3     Quarterly Strategy Meetings.  Once a quarter, upon 7 days advance written notice to the Licensees, Licensor at its option may hold a meeting at its offices with  Licensee to discuss marketing strategy, designs etc.  All Licensees should have a designated representative attend these strategy meetings.

7.      Advertising/Trade Shows.

7.1     Advertising.  Licensee shall have the right to determine its own product planning and sales and advertising policies.

7.2     Advertising Minimum; Public Relations.  Licensee shall spend not less than two percent (2%) of its Net Sales (or the applicable Minimum Sales, whichever is greater) during each Contract Year toward the advertising, promotion and marketing of the Licensed Products during the applicable Contract Year.  Licensee shall at a minimum pay for and prepare photo look books and line sheets and updated press kits even if Licensee has already spent 2% of the Net Sales on advertising, promotion, and marketing of the Licensed Products during the applicable Contract year.  In no event shall Licensor be obligated to spend monies related to the advertising, promotion and marketing of the Licensed Products.  As part of the 2%, Licensee shall also spend $3,000 per month for public relations expenses by contracting with Fingerprint PR for such services.

7.3     Approval of Advertising/Marketing/Promotion Materials by Licensor.  All advertising, marketing and promotional materials concerning Licensed Products and/or the Trademark not procured from Licensor are subject to written approval by Licensor on a case by case basis prior to its publication, exhibition or other use, and Licensee shall not do any advertising without such approval.  Licensor may grant or withhold such approval in its sole discretion, in a reasonable and timely manner, within ten (10) business days of Licensor's receipt of such materials.  If Licensor fails to provide a response to any of the proposed advertising materials within ten (10) business days of the receipt of  such materials described above, then the materials will be deemed approved by Licensor.

7.4     Trade Shows.  Licensee covenants and agrees for the Term of the Agreement to participate in at least two (2) Magic and/or project shows per year including but not limited to exhibiting the Licensed Products as well as an overseas show as agreed between Licensor and Licensee. Licensor covenants and agrees to provide presentation areas within the Licensor's booth at said Shows at a fee to Licensee, such fee to be determined and agreed to in an addendum to the contract, if necessary.  Licensee shall pay for the actual  costs of the trade shows  based on its proportionate share of the space taken.

5

Licensor a statement of accounting of all Licensed Products invoiced, shipped and/or paid for during such quarter, irrespective of whether any Licensed Products were actually sold during such quarter (the "Royalty Report"). The Royalty Report shall be in such form, and shall contain such information, as Licensor may from time to time direct. Licensee shall also pay the earned royalties due for such quarter, if any, by wire transfer in U.S. Dollars concurrently with Licensee's submission of the Royalty Report. Neither receipt nor acceptance of such royalty payment (nor cashing of any payment check) shall constitute acceptance of the Royalty Report's contents or preclude Licensor from thereafter questioning the accuracy of the Royalty Report or the payment. Time is of the essence with respect to the payment, so if payment is not timely made, an interest charge of the Prime Rate (as set forth in West Coast Edition of the Wall Street Journal) plus 3%, shall be added to the unpaid balance until such balance plus accrued interest is paid in full. For the purpose of this Agreement, the first "Contract Quarter" shall be from the Effective Date through July 30, 2010, and each subsequent "Contract Quarter" shall be a period of 3 months. Subject to the deduction of the Initial Advance, all earned Royalties shall be paid without offset, deduction (other than Allowed Deductions), withholding or other excuse for reduction or non-payment. Licensee shall pay and hold Licensor and its successors, assigns, and its and their officers, directors, representatives, members, managers and agents harmless from and against any and all taxes, customs, duties, levies, imposts or other charges based upon the manufacture, development production, distribution, marketing, sale or use of the Licensed Products.

5.     Record Keeping/Audits

5.1     Systems, Books and Records.  Licensee shall maintain accurate books of account and records covering all transactions relating to this Agreement, specifically including, but not limited to, quantities of Licensed Products manufactured, sold, and shipped. Such books and records shall be separate from Licensee's own internal books and records covering unrelated transactions, and shall be maintained in accordance with generally accepted accounting principles, consistently applied. Licensee shall also maintain an adequate system of internal controls (e.g., policies, procedures, organizational plans, and other measures) to ensure the accuracy and reliability of the financial and operational data included in the required books and records.

5.2     Sales Audit.  Licensor shall have the right once a year, at any reasonable time with at least seven (7) business days prior written notice, to perform audits on or review Licensee's books and records and use any other commercially reasonable procedures to verify compliance with the payment of royalties due hereunder. The cost of said audits shall be borne by Licensor. However, if any audit reveals an underpayment by Licensee of five percent (5%) or more of the payments subject to the audit, Licensee shall pay forthwith to Licensor the reasonable cost of conducting the audits, and all payments found to be due, with interest thereon, at the rate of Prime with a ceiling of 5% computed from the date the unpaid payments would have been due had they been properly accounted for until the date they are paid. All audits and procedures shall be conducted in accordance with generally accepted accounting principles, consistently applied.

6.     Covenants of Licensee.

6.1     Best Efforts.  Licensee will use its best efforts to develop diligently the sale of Licensed Products in the Territory, build and increase sales volumes of Licensed Products consistent with the Territory's potential, promote better customer relations, and enhance the image and further the reputation of Licensor and Licensed Products. As a general matter, Licensee will always act in Licensor's best interest. Where applicable, Licensee will use its best efforts to manufacture and ship Licensed Products in order to meet the demand for Licensed

4

8.     Product Development.

8.1     Design Approval.  Every design of Licensed Products that Licensee desires to market, along with any proposed graphics, labels, tags, or other identifying materials to be used thereon or in connection therewith, shall be submitted to Licensor for written approval.  All submissions for approval shall be at the sole expense of Licensee.  Licensee shall supply Licensor with a prototype or sketches of each design, graphics, labels, tags, etc., along with any other information that Licensor may from time to time reasonably request.  If Licensor fails to approve any of the proposed items within ten (10) business days of receipt of the complete submission package described above, then the items will be deemed approved by Licensor. Licensee agrees to finance one (1) full time employee exclusively dedicated to designing Licensor's Licensed Products and such employee needs to be approved in advance in writing by Lindsay Lohan.  Licensor and Licensee shall maintain the confidentiality of all designs related to Licensor's Licensed Products.

8.2     Approval of Samples.  A sample of each proposed Licensed Product that has received design approval as set forth above shall be submitted by Licensee to Licensor for written approval.  All submissions of samples for approval shall be at the sole expense of Licensee.  Licensee shall supply Licensor with complete specifications of each sample along with material samples, color swatches, and any other information that Licensor may from time to time reasonably request.  All samples shall be submitted on a timely basis so that the approval process (and any changes) may be accomplished in time to allow an orderly distribution of samples to Licensee's sales force and show rooms and timely production of the Licensed Products.  All samples shall be of production grade and quality and shall be made of the materials and in the colors for which Licensee has received design approval.  If Licensor fails to approve any of the proposed items within ten (10) business days of receipt of the complete submission package described above, then the items will be deemed approved by Licensor.

In the event of any modification or change in quality of the items, whether during the approval process or after final approval has been granted, such items shall be re-submitted to Licensor for written approval.  If Licensor determines from any source that the Licensed Products being sold are different in any way from the approved Sample of the Licensed Product, Licensor shall have the absolute right to have Licensee recall all of the Licensed Products and stop the continued manufacture and sale of the Licensed Products in dispute.

Licensee shall disclose all sources for any artwork not supplied by Licensor.  All submissions become the property of Licensor.  Upon Licensee's written request, Licensor shall return prototypes and final artwork at Licensee's expense provided Licensee supplies photographs of same.  Licensee shall not have any rights against Licensor for damages or other remedies by reason of Licensor's failure or refusal to grant any approval referred to in this Section 8.

From each production run, Licensee shall supply Licensor with six (6) production samples of each Licensed Product in each collection, free of charge.

No facsimile transmissions will be accepted for approval.  Notwithstanding the foregoing, submissions by e-mail will be accepted for approval provided that Licensor simultaneously sends Licensee a physical copy of same.

Licensee shall make a good faith effort to complete Sample lines for Fall 2010 by

have charged purchasers who deal at arm's length with Licensee. Net Sales does not include the sale and/or gratuitous distribution of a commercially reasonable number of samples to Licensee's sales force for the sole purpose of obtaining sales of Licensed Products, or sales to Licensor, or reasonable premiums to celebrities and other such promotional items subject to Licensor approval.

4.4. Guaranteed Minimum Royalties and Minimum Sales. Licensee shall pay to Licensor, as guaranteed minimum royalties, the following amounts ("Minimum Royalties") against the following minimum sales ("Minimum Sales"), irrespective of the actual Net Sales of Licensed Products during those terms.

| Initial Term | Minimum Sales | Minimum Royalties |
|---|---|---|
| 12-1-09 – 5-15-13 | $9,000,000.00 | $200,000 USD – Contract Year 1<br>$300,000 USD – Contract Year 2<br>$400,000 USD – Contract Year 3 |

| Renewal Term | Minimum Sales | Minimum Royalties |
|---|---|---|
| 5-16-13 – 5-15-06 | $18,000,000 USD | $500,000 USD – Renewal Year 1<br>$600,000 USD – Renewal Year 2<br>$700,000 USD – Renewal Year 3 |

The Minimum Royalties for the Initial Term and the Renewal Term, if any, shall be paid quarterly, in advance, and shall be credited against and applied to the actual royalties due for the quarter during which the Minimum Royalties are paid. The first quarter of the Minimum Royalties shall be due under this Agreement on July 30, 2010; the next quarterly Minimum Royalty payment shall be made on October 30, 2010; the next quarterly Minimum Royalty payment shall be made on January 30, 2011; and the next quarterly Minimum Royalty payment shall be paid on April 30, 2011 and so on and so forth each and every contract year throughout the existence of this Agreement.

The Minimum Royalties paid for each Contract Year shall be applied only to the actual royalties that accrue during that Contract Year, and shall not be applied to any royalties (including Minimum Royalties) that accrue during any other Contract Year.

Any Minimum royalties not paid within the dates set forth above shall accrue interest at the Prime Rate (as set forth in West Coast Edition of the Wall Street Journal) with a ceiling of 5% until paid in full.

Even if Licensee is unable in good faith to reach the Minimum Sales requirement within the Contract Year, so long as Licensee timely pays the Minimum Royalties as they come due, Licensee shall not be in default of this Agreement.

4.5 Quarterly Statements and Royalty Payments. No later than 30 days after the end of each Contract Quarter (as defined herein) (i.e., no later than August 30 for the quarter ending on July 30, November 30 for the quarter ending on October 30, February 28 for the quarter ending on January 31, and May 30 for the quarter ending on April  30), Licensee shall send to

3

February 15, 2010 but no later than May 15, 2010.

Licensee agrees to adequately fund the design and development of cosmetic products if such products are designed and developed pursuant to the terms and provisions herein.

9.    Product Distribution.

9.1    Sales Standards.  Licensee acknowledges the marketing techniques and retailing standards of Licensor and agrees to maintain these standards to protect the value of the Trademark and the image of Licensed Products.  Licensee shall maintain the same or higher standards for the selection of retail and wholesale channels of distribution as those maintained by Licensor prior to this Agreement, unless Licensor lowers its standards, at which time, upon written notice to Licensee, Licensor's new standards will apply.

9.2    Authorized Distribution Channels.  Licensee agrees to sell Licensed Products only in those department stores, boutiques and specialty stores that are consistent with the standards of retail stores in which Licensor has historically sold Licensed Products; provided however, Licensee may sell closeout goods to discounters such as Marshalls and Ross up to thirty percent (30%) of the total Net Sales in any Contract Year or up to the amount of Licensor's and/or its subsidiaries' total off-price and/or closeout sales during each Contract Year, whichever is greater.  Licensee shall not under any circumstances sell Licensed Products through any parking lot sales, swap meets, flea markets and similar distress sale or disposal techniques.  Licensee shall not require any purchaser to purchase any merchandise other than Licensed Products as a condition to the purchase of Licensed Products.  In view of the importance of maintaining high quality channels of distribution for distribution of Licensed Products, any breach of this Section shall constitute an immediate, material breach of this Agreement.

9.3    Intentionally Deleted.

9.4    Exclusive Website/Internet Sales/Internet Advertising.  Licensee has the exclusive right to develop, create, generate, or own an Internet home page, e-mail address, and website domain name, which displays the Trademark (other than Licensor's right to develop, create, generate, or own an Internet home page, e-mail address, and website domain name, which displays the Trademark).  Licensor authorizes Licensee the exclusive use of the domain name: "6126 by Lindsay Lohan.com" for the website (the "Website").  Licensee shall have the right to sell Licensed Products on or through the Website or any website on the internet, without the prior written approval of Licensor.  In exchange, Licensee shall spend not less than ten percent (10%) of its Net Sales generated from the Website during each Contract Year toward the advertising, promotion and marketing of the Licensed Products.  Notwithstanding anything to the contrary herein, Licensee acknowledges and agrees that Lindsay Lohan can develop, create, generate, or own an Internet home page, e-mail address, and website domain name which will be the official website of Lindsay Lohan ("LL Website").  The LL Website will provide a link on the home page of the Website, and the Website will provide a link on the home page of the LL Website, in an effort to promote both websites.  Licensee agrees and acknowledges that the LL Website will sell 6126 products, including Licensed Products.

9.5    Brick & Mortar Stores.  Licensee shall also have the exclusive right, at its own discretion, to open brick and mortar stores throughout the Territory so long as it provides written notice in advance to Licensor and so long as Licensee obtains Licensor's prior written approval with respect to the location and design (both interior and exterior) of the store(s).  Licensee also needs Licensor's prior written approval with respect to any other brands Licensee desires to

7

market, promote, and/or sell in the store(s). In exchange, Licensee shall pay a royalty to Licensor of 10% of its Net Sales whether Licensee or a third party franchisee opens a store in the same manner and on the same basis as set forth in Section 4.5, above.

9.6     Sales Force. Licensee is solely responsible for hiring, training, maintaining, managing and adequately compensating an adequate and professional sales force for the sale of Licensed Products. In managing the sales force, Licensee shall use its best efforts and act in a commercially reasonable manner.

9.7     Exclusive Use of Designs. Licensee acknowledges that there is and will be substantial design input from Licensor towards Licensed Products. Licensor and Licensee agrees that Licensee shall not manufacture, market, sell or use any styles or designs being used in Licensed Products for private label purposes or in any of Licensee's other lines. Licensee agrees that all existing and future designs of Licensed Products are and shall remain the sole and exclusive property of Licensor and that Licensee will not manufacture or sell products using the designs of Licensed Products under any name or label other than the Trademark. Notwithstanding the foregoing, Licensor acknowledges Licensee and/or its affiliates existing license to the ED HARDY brand, the CHRISTIAN brand, which the parties hereby agree does not constitute a breach of this Section or any other section of this Agreement.

9.8     Gray Market. Licensee acknowledges and agrees that: (i) a "gray market" exists or may develop regarding Licensed Products, (ii) Licensor has limited power to prohibit, control or regulate such gray market and, consequently, (iii) Licensor shall have no liability to Licensee for gray market goods that enter or are sold in the Territory. Nevertheless, the Parties shall each use their best efforts to prohibit, control and regulate such gray market. Licensee further acknowledges and agrees that Licensor has no responsibility for the actions of third parties that sell, distribute, trade in, or otherwise attempt to exploit Licensed Products or merchandise similar thereto, within or outside of the Territory, and regardless of whether such third parties obtained such products from authorized or unauthorized sources. Notwithstanding these provisions, Licensor shall use commercially reasonable efforts to protect and maintain the full rights and content of the exclusive rights granted to Licensee in the Territory. Upon the issuance of Certificates of Trademark Registration for the application identified above, Licensor will register such Trademark(s) with the U.S. Customs service.

9.9     Foreign Distribution. Licensee may use one or more distributor for the distribution of the Licensed Product in the Territory so long as Licensee obtains Licensor's prior written approval, on a case by case basis, which shall require the submission to Licensor of the proposed distribution agreement. Upon receipt of said distribution agreement, Licensor shall provide Licensee a response within ten (10) business days. If Licensor fails to provide Licensee a response within ten (10) business days then the distributer shall be deemed approved. Failure to obtain said approval and/or provide the distribution agreement in question shall be deemed a material breach of this Agreement.

10.     Quality Control.

10.1     Quality of Licensed Products. Licensee acknowledges that Licensed Products must maintain the image and quality of the Trademark in order to maintain and/or build goodwill and a favorable public recognition of the Trademark and Licensed Products in the Territory. Therefore, Licensee represents warrants and covenants that all Licensed Products shall be of a high standard of quality and of such style, appearance, and quality so as to be suited for exploitation of the licensed rights under this Agreement to the best advantage of both Parties. Licensor has the right to make on-site inspections at any reasonable time following written notice to Licensee and from time to time at all manufacturing and distribution points to ensure

8

the quality of Licensed Products manufactured by Licensee. If, at any time, Licensor determines in its sole reasonable discretion that any Licensed Products are of lesser quality than the samples approved pursuant to this Agreement, Licensor shall give Licensee written notice thereof and Licensee shall immediately cease production and distribution of those Licensed Products.

10.2    Compliance with Regulations/Tie Ins.  All Licensed Products shall be manufactured, advertised, sold and distributed in accordance and in compliance with, all applicable laws and regulations, including but not limited to product testing, labeling requirements, import and export regulations, and any other valid laws within the Territory. Licensee shall keep Licensor informed of any complaint or action by any governmental authority, regulatory authority or consumer group relating to Licensed Products, and shall take affirmative action to resolve any such complaint.

10.3.    Warranty By Licensor.  Licensor hereby represents and warrants that it has full and lawful title to the Trademark and/or is in the process of obtaining such lawful title thereto in the United States.  In the event that Licensor is determined not to have full and lawful title to the Trademark in the United States as warranted herein by a court of competent jurisdiction then Licensee shall be entitled to immediately at its option terminate this Agreement.

10.4    Working Conditions and Laws.  Licensee represents, warrants and covenants that it and each manufacturer or other supplier of Licensed Products within the laws of the Country in which it manufactures (collectively "Manufacturer(s)"):

A.    shall not use child labor in the manufacturing, packaging or distribution of any Licensed Product (the term "child" refers to a person younger than the age for completing compulsory education in the United States, but in no case shall any child younger than fourteen (14) years of age be employed in the manufacturing, packaging or distribution of Licensed Articles);

B.    shall provide employees with a safe and healthy workplace in compliance with all applicable laws, statutes, rules, decrees, regulations or other legal standards (collectively, "Laws") and shall provide Licensor with all information Licensor may request about manufacturing, packaging and distribution facilities used in connection with the Licensed Articles;

C.    only shall employ persons whose presence is voluntary and shall not use prison labor or corporal punishment or any other form of coercion as a form of discipline of employees;

D.    shall comply with all applicable Laws including, but not limited to, those pertaining to minimum wage, overtime and maximum hours, and the protection and preservation of the environment, and shall utilize fair employment practices as defined by applicable Laws; and

E.    shall not discriminate in hiring or employment practices on the basis of race, religion, national origin, political affiliation, sexual preference or gender.

11.    Copyrights and Trademark.

Licensor shall pay all costs and fees related to United States and foreign copyright and trademark applications and registrations related to the Licensed Products which shall be in the name of Licensor as owner/applicant.  Licensor agrees to have a European Union trademark

9

application filed in connection with the Trademark no later than thirty (30) days after execution of this Agreement.

11.1    No Registrations.  Licensee will not apply for any registration of copyright, trademark or trade name that incorporates or consists of the Trademark or any part thereof or is substantially similar thereto without the prior written consent of Licensor on a case by case basis.  In any case, Licensee will transfer to Licensor, upon Licensor's request (whether during or after the term of this Agreement), at Licensee's sole expense, full and complete ownership of any and all such applications, registrations, trademarks, copyrights, or trade names whether or not they were obtained with the permission of Licensor.

11.2    Ownership of Trademark.  Licensee agrees that the Trademark, all goodwill currently pertaining thereto, and all rights, registrations, applications and entitlement thereto, and all extensions thereof, are and shall remain the sole and exclusive property of Licensor.  Whenever requested by Licensor, whether during the term of this Agreement or thereafter, Licensee shall, at Licensor's sole expense, execute such documents as Licensor may deem necessary or appropriate to confirm, maintain or perfect Licensor's ownership of the Trademark and/or such rights.

11.3    Use in Business Names and on Other Products.  Except as this Agreement specifically authorizes the use of the Trademark, and only to that extent, Licensee shall not use the Trademark or any part thereof, or any similar words or names, in its business name without the prior written consent of Licensor on a case by case basis.  Any permission granted by Licensor hereunder shall terminate upon reasonable notice by registered mail from Licensor to Licensee except as specifically allowed by the post termination provision of this Agreement.  Licensee shall not manufacture or sell products, other than Licensed Products, that bear trademarks identical to or confusingly similar to the Trademark.

11.4    Non-Conflict.  Licensee shall not use the Trademark in any manner that conflicts with the rights of any third party.  If, in Licensor's sole determination, reasonably exercised, any use of the Trademark by Licensee infringes the rights of any third party or weakens or impairs Licensor's rights in the Trademark, Licensee will immediately terminate or modify such use in accordance with Licensor's instructions.  The foregoing is subject to Licensee's exclusive rights as set forth in this Agreement.

11.5    Ownership of Copyrights.  Licensor has the right, in its sole discretion, to register in its name the copyright on any and all graphics, artwork and writings developed by Licensee or incorporated in or on or associated with Licensed Products.  Licensee agrees that all such artwork and writings and the copyrights thereto are the sole and exclusive property of Licensor, and that this document shall operate to execute any copyright assignments or other documents deemed necessary by Licensor to transfer, perfect or confirm copyright ownership in and to Licensor.

11.6    Trademark/Copyright/Labels.  All Licensed Products shall have a label and/or hangtag designated or approved by Licensor in writing.  Licensee shall place legally sufficient trademark notices on all labels and hangtags, and legally sufficient copyright notices on all designs, samples and other creations and writings that are capable of protection pursuant to the copyright laws of the Territory.  Licensor shall have the right at any time and from time to time to designate the exact symbols or language to be used by Licensee for such notices.  Licensee understands the importance of maintaining the security and integrity of all labels used on Licensed Products, and agrees to maintain a strict, accurate and current policy regarding all labels to help preclude diversion of labels.  No labels, hangtags or identification other than those designated by Licensor shall appear on Licensed Products without the prior written approval of

Licensor; provided however, that Licensee may include a label for care, content, size and country of origin. If Licensor fails to approve any of the submitted labels or hangtags within ten (10) days of receipt, then the items will not be deemed approved by Licensor.

11.7    Accurate Use of Trademark. Licensee acknowledges that the accurate and reasonable representation of the Trademark, as directed by Licensor, is mandatory on the part of Licensee with respect to any reproduction by Licensee, whether appearing on Licensed Products or in print or anywhere else. Licensee further agrees that the Trademark will always be exactly reproduced, unless prior written authorization for modification is received from Licensor on a case by case basis. Each use of the Trademark on Licensed Products shall be submitted to Licensor for prior written approval pursuant to the approval procedures set forth above in this Agreement. As provided in Section 6 hereof, all uses of the Trademark in advertising, marketing and promotional materials must be approved in advance by Licensor in writing.

11.8    Trademark Infringement or Misuse. Licensee shall notify Licensor in writing within fifteen (15) days of discovery by Licensee of any infringements or imitations by others of the Trademark in connection with products within the categories licensed to Licensee under this Agreement. Licensee shall have the right, but not the obligation, to institute and prosecute actions against third parties for infringement of the rights licensed in this Agreement. Licensee may institute and prosecute such actions through attorneys of its own choosing to be paid by Licensee. Licensee shall retain fifty percent (50%) of all sums recovered from the infringer in any such action, whether by judgment, settlement or otherwise after recovery of Licensee's attorneys' fees and costs, with Licensor to receive the remaining fifty (50%) percent. If Licensee does not institute a lawsuit within thirty (30) days after Licensor's written request that it do so, Licensor shall have the right, but not the obligation, to institute and prosecute actions for infringement of the rights licensed in this Agreement. Licensor may institute and prosecute such actions through attorneys of its own choosing and retain fifty percent (50%) of all sums recovered from the infringer in any such lawsuit, whether by judgment, settlement or otherwise recovered from the infringer after recovery of Licensor's attorneys' fees and costs, with Licensee to receive the remaining fifty (50%) percent. Upon request of the party bringing the action, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. The party bringing such suit shall reimburse the other party for the expense incurred as a result of such cooperation. Whoever brings the suit has the right to settle pursuant to the terms of this Agreement or turn over the action to the other; provided however, that Licensee shall not enter into any settlement that allows the third party to continue the alleged infringement, or that would be reasonably likely to adversely affect or to damage Licensor's goodwill, without the prior written approval of Licensor.

11.9    Work For Hire. Licensee shall insure that all works created by or on behalf of Licensee in connection with the Licensed Products are "works made for hire" within the meaning of the U.S. Copyright Act of 1976, as amended, and shall be prepared by Licensee's employees under Licensee's sole supervision, responsibility, direction, control and monetary obligation, within the course and scope of each such person's employment or, alternatively, shall be created by consultants, contractors or other third parties pursuant to "work for hire" agreements or agreements containing copyright assignment language, as provided below. If any part or element of any Licensed Product, or any right, title or interest therein, is acquired by or licensed to Licensee from any other person, or if any non- employee of Licensee contributes to the creation of any such work, Licensee shall obtain from each such other Person and non-employee and shall deliver to Licensor, a written assignment, in form and substance satisfactory to Licensor, by which all right, title and interest in and to the applicable proprietary rights and Licensed Products materials and all associated good will, throughout the universe in perpetuity,

11

now known or hereafter devised, vest in Licensor exclusively, irrevocably, and unconditionally, free and clear of any and all claims, encumbrances, rights, titles or interests of any kind or nature whatsoever.

12.    General Representations and Warranties

12.1    By Licensor.

Licensor represents and warrants and further agrees that: (a) it is duly organized, validly existing and in good standing under the laws of the state of its organization, with all requisite power and authority to enter into and perform this Agreement; and (b) this Agreement has been duly authorized by all requisites corporate or other action and Licensor has all necessary power and legal capacity to enter into and perform this Agreement.

12.2    By Licensee.

Licensee represents and warrants and further agrees that: (a) it is duly organized, validly existing and in good standing under the laws of the state of its organization, with all requisite power and authority to enter into and perform this Agreement; (b) this Agreement has been duly authorized by all requisites corporate or other action and Licensee has all necessary power and legal capacity to enter into and perform this Agreement; and (c) it has and at times will continued to have the financial and other resources necessary to pay, perform and discharge all of its obligations under this Agreement.

13.    Indemnification/Insurance.

13.1    By Licensee.  Licensee agrees to defend, indemnify and hold Licensor and its successors, assigns, and its and their officers, directors, representatives, members, managers and agents harmless from and against any and all claims, judgments, liabilities, damages, penalties, losses or expenses (including attorney's fees and costs, whether or not any legal proceeding has commenced) incurred by reason of, or arising out of (a) any alleged or actual defect in any Licensed Products manufactured by Licensee or any manufacturer, supplier, subcontractor or sublicensee of Licensee, or on Licensee's behalf; (b) the manufacture, advertising, marketing, distribution or sale of Licensed Products; (c) the use of the Trademark in a manner not approved by Licensee as provided in this Agreement; or (d) the failure to comply with any other applicable laws.  Licensee shall have the right to undertake and conduct the defense of any suit so brought through counsel of Licensee's choice, subject to Licensor's right of approval, not to be unreasonably withheld or delayed; provided however, that Licensee shall not enter into any settlement that would be reasonably likely to adversely affect or to damage the Licensor's goodwill, without the prior written approval of Licensor.  Licensor shall also have the right to participate fully in such defense, including the right to be further represented by independent counsel of its own choice, at its own expense.  The provisions of this paragraph and Licensor's obligations hereunder shall survive the expiration or termination of this Agreement.

13.2    By Licensor.  Licensor agrees to defend, indemnify and hold Licensee harmless from and against any and all claims, judgments, liabilities, damages, penalties, losses or expenses (including attorney's fees and costs, whether or not any legal proceeding has commenced) incurred by reason of, or arising out of the infringement of the trademark rights of a third party by Licensee's use of the Trademark as contemplated by, and in compliance with, the terms of this Agreement.  Licensor shall have the right to undertake and conduct the defense of any suit so brought through counsel of Licensor's choice, subject to Licensee's right of approval, not to be unreasonably withheld or delayed.  Licensee shall also have the right to

12

participate fully in such defense, including the right to be further represented by independent counsel of its own choice, at its own expense. The provisions of this paragraph and Licensor's obligations hereunder shall survive the expiration or termination of this Agreement.

13.3   Insurance. Upon execution of this Agreement, Licensee shall have and maintain at its sole cost and expense throughout the Initial Term and, if applicable, any Renewal Term of this Agreement, post-termination or expiration sell-off period, and for three (3) years thereafter, standard liability insurance from a recognized insurance company acceptable to Licensor. This insurance coverage shall provide general commercial liability insurance for each occurrence, bodily injury, property damage, intellectual property liability, personal injury, product liability, contractual liability, advertising injury liability and infringement claims relating to trademark, trade dress, patent and copyright, and unfair competition claims, in the aggregate amount of $2,000,000.00 per occurrence , and shall have no right of subrogation. Such insurance coverage shall name Licensor as an additional insured party against any and all claims, demands, causes of action, or damages, including reasonable attorney's fees. Within thirty (30) days after this Agreement is fully executed, (and thereafter at least thirty (30) days prior to the expiration of insurance coverage), Licensee shall furnish to Licensor a Certificate of Insurance evidencing the foregoing coverage and specifically listing Licensor as an additional insured party.

14.   Assignability.

14.1   Assignments. This Agreement and Licensee's rights under this Agreement are personal to Licensee and may not be transferred or assigned without the prior written consent of Licensor. The transfer of a majority of the issued and outstanding capital stock of Licensee other than to a directly or indirectly controlled affiliate of Licensee, however accomplished, and whether in a single transaction or in a series of related or unrelated transactions, or any other event or series of events resulting in a change of control of Licensee, shall be deemed an assignment of Licensee's rights hereunder that may not be accomplished without the prior written consent of Licensor. If Licensee transfers a majority of the issued and outstanding capital stock of Licensee to a directly or indirectly controlled affiliate of Licensee, then that affiliate may assume the rights and obligations under this Agreement provided that the affiliate undertakes in writing to fulfill the provisions of this Agreement. Any attempted assignment of Licensee's rights under this Agreement without the prior written consent of Licensor is a nullity. Any attempt by a non-approved assignee or transferee to do business under this Agreement shall entitle Licensor to forthwith terminate the rights of Licensee under this Agreement. Licensor may assign its rights and delegate its duties under this Agreement provided that the assignee undertakes in writing to fulfill the provisions of this Agreement. Subject to the restraints on assignment set forth above, this Agreement shall be binding upon and shall inure to the benefit of all successors and assigns of the parties.

14.2   Sublicenses. Licensee shall not sublicense this Agreement to any third party without the prior written consent of Licensor, which consent shall not be unreasonably withheld, and may be subject to any conditions or requirements that Licensor may impose, in Licensor's sole discretion except that if Licensee or Henri Levy is 25% or more of an owner of a sub-licensee, no advance approval shall be required only notification of same. Licensee shall submit for prior written approval by Licensor a copy of any proposed sublicense agreement. Any sublicense or attempted sublicensing without the prior written consent of Licensor shall be null and void and shall constitute a material breach of this Agreement.

14.3   Contract Manufacturers. Licensee shall have the right to subcontract the actual manufacture of Licensed Products. At Licensor's request, Licensee shall promptly inform Licensor in writing of (i) the identity and location of each such subcontractor and (ii) the

Licensed Products being subcontracted.  Licensee agrees to take reasonable precautions in its dealings with subcontractors to protect the rights of Licensor in and to the Trademark.  Licensor may require Licensee to enter into written agreements with subcontractors concerning the manufacture of Licensed Products, and to include in those agreements provisions to protect the rights of Licensor hereunder, including without limitation a covenant by the subcontractor not to sell or otherwise dispose of any Licensed Products, or any piece goods, trims, labels, fasteners, etc. bearing the Trademark, to any unauthorized person or entity without the prior written consent of Licensor.  Licensee shall not use any subcontractor who fails to sign such agreement.

14.4    No Hypothecation.  Except as may be reasonably required by Licensee's factor or other lending institutions financing Licensee's sales of Licensed Products, Licensee shall not pledge, hypothecate, mortgage, grant liens in or upon, grant security interests in, use as collateral or otherwise borrow upon any of Licensee's rights under this Agreement without the prior written consent of Licensor.  Any such action without consent shall be void and of no effect and shall entitle Licensor to terminate Licensee's rights under this Agreement.

15.    Termination.

15.1    Default in Licensee Payment.  Licensor may terminate this Agreement if Licensee defaults by failing to make timely payment of any payment due to Licensor, including without limitation royalties (including Minimum Royalties); provided however, that Licensee shall have ten (10) days following Licensor's written notice of such default to cure the default by payment of the entire balance due plus interest thereon.

15.2    Other Defaults.  Unless otherwise provided, either party may terminate this Agreement if the other party defaults or breaches any material term or obligation hereunder; provided however, that in the event such default or breach is capable of being cured within 30 days, then the defaulting party shall have thirty (30) days following written notice of such default or breach to cure the default or breach.

15.3    Late Payments.  Regardless of whether a default is declared by Licensor with respect to any late payment under this Agreement, Licensor is entitled to and shall be paid by Licensee interest at the rate of Prime plus 3%, on any late payment until all principal and interest on said payment is paid in full.  The acceptance of late payments hereunder shall not constitute a waiver of timely payments.  If this Agreement is terminated as a result of an uncured default by Licensee, all payments required hereunder shall be due to Licensor immediately, in full, plus interest at the rate of Prime plus 3%, from the date due or the date of Landlord's notices of default, whichever is earlier.

15.4    Bankruptcy.  Either party shall have the right to terminate the rights of the other under this Agreement if such other party becomes insolvent, or voluntarily or involuntarily files or is the cause of a third party filing a petition for its bankruptcy, or is adjudicated a bankrupt.

15.5    Acts Detrimental To Brand.  Licensee acknowledges that (i) Licensee is one of several current and future licensees of the Trademark and related marks; (ii) the actions and omissions of Licensee can greatly impact the business and profits of Licensor, as well as the business and profits of the other licensees of Licensor and the value of the Trademark and related marks both in the Territory, and in other territories; (iii) change in the ownership of Licensee which shall mean a change in more than 25% of the ownership of Licensee; and (iv) the quality of production, timely delivery of goods, cooperation with Licensor and other licensees of Licensor, and conduct of Licensee's business can greatly impact the business and profits of Licensor and the value of the Trademark.  Therefore, if Licensee takes any action or fails to take

14

any action and such action or omission, in the reasonable opinion of Licensor, is materially harmful to Licensor's business interests, including without limitation the Trademark, this Agreement, and Licensor's agreements with other licensee's of the Trademark, then Licensor shall have the right to terminate this Agreement by giving Licensee at least thirty (30) days prior written notice of the acts or omissions; provided however, that during the thirty (30) day notice period should those acts or omissions be cured or corrected, then said notice of termination shall be suspended for so long as the acts or omissions remain cured or corrected.

15.6    Injunctive Relief.  Licensee acknowledges that the Trademark possesses a special, unique and extraordinary character that makes difficult the assessment of monetary damages that would be sustained by Licensor from the unauthorized use of the Trademark, and that irreparable injury would be caused by such use.  Licensee further acknowledges that it would be difficult to fully compensate Licensor for damages for any violation by Licensee of the provisions of this Agreement relating to the protection of, or the use of the Trademark and/or other intellectual property of Licensor.  Accordingly, Licensee acknowledges that Licensor may be entitled to temporary injunctive relief without the need to post a bond or other security based upon allegations of Licensee's unauthorized use of the Trademark or violation of the provisions of this Agreement relating to the protection of, or the use of the Trademark and/or other intellectual property of Licensor, and agrees that Licensor shall be entitled to permanent injunctive relief if such allegations are proven to be true in accordance with the applicable law, and in the context of the applicable judicial proceedings.  This provision with respect to injunctive relief shall not, however, diminish the right of Licensor to claim and recover damages in addition to or in lieu of injunctive relief, neither may it be interpreted or understood as a waiver of the Licensee's rights of defense in or outside judicial proceedings regarding injunctive relief, other than the defense that injunctive relief is not an available remedy.

15.7    Remedies Cumulative.  The remedies provided in Sections 14.2 - 14.7 hereof are cumulative and not exclusive.  In addition to these remedies, the Parties may exercise any and all other rights and remedies available under other provisions of this Agreement or applicable law.  Licensor may terminate the rights of Licensee under this Agreement for the reasons set forth above or for other reasons provided for in other provisions of this Agreement.

16.    Post Termination

16.1    Post Termination Rights and Duties.  All of the following rights and duties shall be applicable upon any termination of Licensee's rights under this Agreement, whether by expiration of the Term hereof or by earlier termination pursuant to the provisions hereof.

16.2    Deletion of Trademark.  Immediately upon termination or expiration of this Agreement, Licensee shall take steps to change its name if it was authorized under this Agreement to incorporate into its name the Trademark or any part thereof, and delete the Trademark or any part thereof from any signs, business documents, letterhead, business cards, and any other uses.  This change of name and deletion shall be completed within thirty (30) days after termination, except to the extent used in connection with the post-termination liquidation of inventory as provided in this Agreement.

16.3    Disposition of Licensed Products and Work In Process.  Upon termination or expiration of this Agreement, Licensor shall have the right, but not the obligation, to purchase any and all finished Licensed Products and work-in-process Licensed Products, in the possession of Licensee or any manufacturer, supplier, subcontractor or sublicensee of Licensee, at a price equal to Licensee's (or the applicable manufacturer's, supplier's, subcontractor's or sublicensee's) cost of production.  Licensee shall deliver to Licensor a list of these items, and their respective costs, within fifteen (15) days of the date of termination or

15

expiration of this Agreement, and Licensor shall have fifteen (15) days from Licensor's receipt of that list to provide written notice of its exercise of the purchase rights hereunder. If Licensor exercises its purchase rights hereunder, then the items purchased by Licensor shall be immediately delivered to Licensor, and paid for by Licensor within thirty (30) days of Licensor's receipt thereof. If Licensor declines or fails to exercise its purchase rights hereunder, then Licensee shall have ninety (90) days thereafter (the "Sell Off Period") to finish the work-in-process Licensed Products not purchased by Licensor, and to sell those finished work-in-process Licensed Products, and any other finished Licensed Products not purchased by Licensor. In no event shall Licensee repackage, reconfigure or sell the Licensed Products after the ninety (90) day Sell Off Period. All remaining products shall be immediately destroyed by Licensee, and Licensee shall send Licensor a certificate of destruction related thereto. Licensee shall report to Licensor, and pay Royalties on, any and all sales of Licensed Products under this Section, except sales to Licensor.

16.4    Disposition of Production Materials. Upon termination or expiration of this Agreement, Licensor shall have the right, but not the obligation, to purchase any and all patterns, markers and other production materials used in connection with the manufacture of Licensed Products, including without limitation all equipment that have no function other than the reproduction of the Trademark, and any and all trims, labels, fasteners (snaps, buttons, etc.) and other production materials bearing the Trademark, in the possession of Licensee or any manufacturer, supplier, subcontractor or sublicensee of Licensee, at a price equal to Licensee's (or the applicable manufacturer's, supplier's, subcontractor's or sublicensee's) cost of production. Licensee shall deliver to Licensor a list of these items, and their respective costs, within fifteen (15) days of the date of termination or expiration of this Agreement, and Licensor shall have fifteen (15) days from Licensor's receipt of that list to provide written notice of its exercise of the purchase rights hereunder. If Licensor exercises its purchase rights hereunder, then the items purchased by Licensor shall be immediately delivered to Licensor, and paid for by Licensor within thirty (30) days of Licensor's receipt thereof. If Licensor declines or fails to exercise its purchase rights hereunder, then Licensee shall immediately destroy the items not purchased by Licensor. Licensee shall be strictly liable for any damages to Licensor resulting from any of these items wrongfully coming into the possession of a third party.

16.5    Survival of Obligations. The termination or expiration of this Agreement shall not terminate Licensee's duties, obligations and responsibilities (i) to timely pay all monies owed, including Royalties due for post-termination shipments and sales of Licensed Products, (ii) to timely, fully and accurately report Licensee' activities regarding Licensed Products, including post-termination shipments and sales of Licensed Products (iii) regarding the protection of the Trademark and copyrights and the full and complete ownership of the Trademark and copyrights by Licensor, and (iv) to indemnify and hold harmless Licensor pursuant to Section 12 hereof. Licensor's rights to inspect and audit the books and records of Licensee will survive for a period of three years following the date of termination of this Agreement.

17.    General Provisions.

17.1    Payments. All payments due hereunder to Licensor shall be payable directly to Licensor at the address written below.

17.2    Notices. Any notice hereunder shall be given in writing and delivered in person, by overnight delivery, addressed to the address first listed below, or to such other address as the Party addressed shall have previously designated in accordance with this Section, or by facsimile to be considered delivered at the time of sending, or by electronic mail, email addresses to be provided at the time of execution of this agreement. A notice shall be deemed delivered on the date delivered in person, or on the date actually received if delivered by

16

overnight delivery, facsimile or by email. The Notices shall be sent as follows:

**To Licensor:**

6126, LLC
c/o The Loft Agency
9744 Wilshire Boulevard, #209
Beverly Hills, California 90212
Attn: Kristi Kaylor
P: (310) 246-0385
F: (310) 246-7403
Email: krist@6126collection.com

**With a Mandatory Copy To:**

Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard,
9th Floor
Los Angeles, California 90064
Attn: David Hochman, Esq.
P: (310) 478-4100
F: (310) 478-6363
Email: dhochman@wrslawyers.com

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
P: (212) 407-4216
F: (212) 202-4374
Email: dwhite@loeb.com

**To Licensee:**

DNAM Apparel Industries, LLC
433 S. Spring Street
8th Floor
Los Angeles, California 90013
Attn: Henri Levy
P: (213) 627-4905
F: (213) 626-7108
Email: henrilevy@aol.com

**With A Mandatory Copy To:**

Adam S. Rossman, Esq.
433 S. Spring Street
Suite 402
Los Angeles, CA 90013
P: (213) 891-1007
F: (213) 891-1009
Email: adamrossman@hotmail.com

17.3   Entire Agreement.  This Agreement constitutes the sole and entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior negotiations, dealings, agreements and understandings of the Parties in connection therewith, and completely supersedes and replaces all prior agreements between the Parties with respect to the subject matter of this Agreement.

17.4   Severability.  The invalidity or unenforceability of any provision hereof shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

17.5   Amendment.  No amendment, modification or alteration of this Agreement shall be valid unless it shall be in writing and signed by the Parties.  No course of conduct or method of doing business shall modify or amend the terms hereof.

17.6   No Agency.  This Agreement does not constitute and shall not be construed as constituting an agency, a partnership or joint venture between the Parties.  Licensee shall have no right to obligate or bind Licensor in any manner whatsoever, and nothing contained in this Agreement shall give, or is intended to give, any rights of any kind to any third persons.

17.7   Not a Franchise.  The Parties acknowledge and agree that: (i) this Agreement is an intellectual-property-rights license agreement and does not constitute, and shall not be construed as, a franchise agreement; (ii) franchise laws do not and will not apply to this Agreement or to the relationship between the Parties and their respective rights and obligations hereunder; and (iii) due to the Parties' respective business backgrounds and experience, they do not need the protection of franchise laws.

17.8   Governing Law/Jurisdiction/Mediation.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to conflicts of laws provisions, and all disputes arising out of or relating to this Agreement or its breach shall be resolved in the courts located within the State of California, County of Los Angeles, and each party hereby submits exclusively to the jurisdiction and venue of those courts.  However, before filing a lawsuit, each party agrees to submit the dispute to mediation before a retired judge at one of the local dispute resolution centers.  If a party files suit before making a good faith attempt to mediate and resolve the dispute, that party shall waive its rights to attorneys fees and costs regardless whether it is the prevailing party in the lawsuit.

17.9   Successors and Assigns.  Subject to the restraints on assignment set forth above, this Agreement shall be binding upon and shall inure to the benefit of all successors and assigns of the Parties.

17.10   Confidentiality.  This Agreement and its terms, conditions and provisions are confidential and shall not be disclosed by Licensee without the prior written consent of Licensor on a case by case basis.  The trade secrets and other confidential information and property of each Party are confidential and shall not be disclosed by the other Party without the prior written consent of the Party that owns the confidential information.

17.11   Headings; Interpretation.  The Section headings are provided in this Agreement for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.  This is a negotiated Agreement and shall be construed to have been drafted by both Parties.

17.12   Further Action.  Each Party hereto agrees to perform all further acts and to execute and deliver all documents that may be reasonably necessary to carry out the intents

18

and purposes of this Agreement.

17.13   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same agreement.

17.14   No Implied Waivers.  The failure of either Party at any time to require performance by the other Party of any provision hereof shall not diminish the full right to require such performance at any time thereafter.  The waiver by either Party of a breach of any provision hereof shall not be a waiver of the provision itself or any other breach thereof.

17.15   Time of Essence; Force Majeure.  Time is of the essence of this Agreement; provided however, that if either Party is delayed or prevented from performing its obligations under any provisions hereof by reasons of fire, strike, labor dispute, government law or regulation, insurrection, war, public disaster, flood, unavoidable casualty, act of God or other material cause beyond the control of the breaching party, then the other Party may terminate this Agreement if the period of non-performance exceeds one (1) month.

17.16   Attorneys' Fees and Costs.  In any dispute arising out of this Agreement, the prevailing party as determined by the Court shall be entitled to its reasonable attorneys' fees and costs.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties, by and through their duly authorized representatives, have entered into this Agreement as of the date first written above.

Licensor:

**6126, LLC**
a Delaware Limited Liability Company

"Managers"

CROSS HEART PRODUCTIONS, INC.

By: _____
Lindsay Lohan

Its: _____

By: _____
Kristi Kaylor

Its: _____

Licensee:

**DNAM APPAREL INDUSTRIES, LLC**

By: _____
Henri Levy

Its:    Managing Member

20

# EXHIBIT A

## CATEGORIES OF LICENSED PRODUCTS

Men's women's and kids' apparel and shoes of all types and size

Cosmetic products excluding self-tanning skin care products (i.e., products that dye the skin to give the appearance of a tan, consisting of self-tanning creams, self-tanning lotions, self-tanning oils, self-tanning gels and self-tanning sprays) and post-tan wipes. For the sake of clarification, "cosmetic products" does not include fragrances.